UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| JESSICA PONCE, AKA: JESSICA FACUNDO,<br> *Plaintiff,* | §<br>§<br>§<br>§ | |
| v. | §<br>§ | Civil No. 5:25-cv-00019 |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,<br> *Defendant.* | §<br>§<br>§<br>§ | |

## MEMORANDUM OPINION AND ORDER

This appeal arises from the Commission's denial of Ms. Ponce's claim for benefits under the Social Security Act. The sole issue on appeal is whether the Administrative Law Judge ("ALJ") erred as a matter of law by failing to consider whether Ms. Ponce can sustain substantial gainful activity despite the waxing and waning nature of her mental impairments. Dkt. No. 7 at 7.[1] Having considered the parties' briefings, Dkt. Nos. 7, 12–13, and the Commissioner's Answer including the administrative record, Dkt. No. 5, the Court finds that Ms. Ponce made a sufficient showing that her mental health symptoms wax and wane in their manifestation. Therefore, the ALJ's failure to consider Ms. Ponce's ability to sustain employment constituted legal error. Furthermore, this error prejudiced Ms. Ponce because the waxing and waning nature of her mental impairments were not properly accounted for when the ALJ determined her residual functional capacity ("RFC").

Accordingly, the decision of the ALJ is hereby **VACATED**, and the case is **REMANDED** for further administrative proceedings to determine whether the claimant can both procure *and*

---

[1] The Court uses the page numbers auto-generated by CM/ECF in its citations to docket entries.

1

sustain substantial gainful employment, rendering her not disabled for the purposes of the Social Security Act. This Court has jurisdiction to review a final determination of the Commissioner under Section 205(g) of the Social Security Act. 42 U.S.C. § 405(g). Both parties have consented to the adjudication of this administrative appeal by the undersigned Magistrate Judge. Dkt. Nos. 9–11; *see* 28 U.S.C. § 636(c).

### *Background*

Ms. Ponce applied for Social Security Disability Insurance (SSDI) and Social Security Income (SSI) benefits under Title II and Title XVI of the Social Security Act, claiming that she is disabled and has been unable to work since July 31, 2022. Dkt. No. 5-4 at 2. Ms. Ponce claimed that she was unable to perform substantial gainful activity due to major depressive disorder, unspecified anxiety, and alcohol use in remission. *Id.* She further had non-severe impairments of obesity, sinusitis, anemia, and acute cystitis, as well as non-medically determinable impairments of developmental academic disorder, history of gastric bypass, headaches, alcohol dependence, and suspected diabetes. Dkt. No. 5-3 at 30.

Ms. Ponce attended school through the tenth grade and received special education while in school. Dkt. No. 5-7 at 13. Her last reported employment was as a custodian for McDonalds in June 2022. Dkt. No. 5-6 at 3. Prior to her mother's passing, she worked as an in-home caregiver to her mother. Dkt. No. 5-7 at 21–28; Dkt. No. 5-8 at 205.

The focus of this appeal is Ms. Ponce's mental ailments, which are largely borne out by the record. The medical evidence of record begins with an evaluation by Border Region Behavioral Health on June 1, 2022, in which Ms. Ponce reported that she had been having mood swings, anger issues, difficulty with sleep, diminished appetite, poor concentration, increased isolation, low motivation/energy, and crying spells. Dkt. No. 5-8 at 194. Ms. Ponce further reported that she

had last had suicidal ideations a few months prior, and that she "wanted to take a bunch of pills" but her son-in-law stopped her. *Id.* She stated that she had recently started working at McDonalds, but she was finding it difficult to follow instructions, was isolated and missing work, and was worried that she was going to be terminated. *Id.*

Shortly thereafter, according to medical payment records, Ms. Ponce was hospitalized overnight in August 2022 for suicidal ideations. Dkt. No. 5-4 at 3; Dkt. No. 5-7 at 16; Dkt. No. 5-8 at 221. The Border Region Behavioral Health report states that she attempted suicide by taking five Seroquel pills and drinking about five tall boys. Dkt. No. 5-8 at 221. The following day, however, Ms. Ponce recanted, saying that she did not take any pills, that she was testing to see if her boyfriend cared for her, and that she wanted to go home. *Id.* Although Plaintiff reported that she was taking her medication daily, she also noted that she was "having commanding hallucinations every day telling her to kill herself or others." *Id.* The Palms Behavioral Health discharge report opined that Ms. Ponce "is at chronic risk of further decompensation, particularly given patient's underlying mental health disorder, possibly underlying structural personality features and impulsive behavior." *Id.* at 24. Moreover, the report emphasized the importance of medication compliance as part of a positive plan to safely address the symptoms of Ms. Ponce's depression. *Id.* at 51, 72.

Yet, her medications continued to be a double-edged sword. At her follow-up appointment on October 31, 2022, Ms. Ponce reported hopelessness, anger issues, and "hearing voices telling her to end her life *by taking her pills*." *Id.* at 225 (emphasis added). At this appointment, Ms. Ponce stated that she was taking her medication as prescribed, but she relied upon her boyfriend's assistance to effectively manage her medications. *Id.* Although she reported that the medications were helping, Ms. Ponce still experienced frequent suicidal thoughts. *Id.* Ms. Ponce also stated

that she did not have stable housing at that time—she and her boyfriend were homeless after being kicked out of her mother-in-law's house. *Id.*; *Id.* at 186.

Ms. Ponce's partner brought her in for another evaluation on November 9, 2022, because Ms. Ponce had suffered a panic attack the night prior that lasted about one hour before her daughter and husband were able to calm her. *Id.* at 196. As a result, the treating physicians increased her dosage of Depakote and added Topiramate to Plaintiff's medication regimen. *Id.* In the Border Region Behavioral Health assessment, Plaintiff's progress was marked "residual symptoms," two steps lower than "stable," due to her residual anxiety and panic attacks. *Id.* at 201. Her prognosis was assessed as "fair," which is just one step above "poor." *Id.*

After several months of reprieve, the record shows that Ms. Ponce was once again admitted to the hospital for psychiatric evaluation on April 19, 2023. Dkt. No. 5-4 at 3. The April 2023 hospitalization occurred when Ms. Ponce's boyfriend called the police because she had said that she wanted to hurt herself. *Id.* Her boyfriend reported that she had suicidal ideations with a plan to cut herself. Dkt. No. 5-8 at 216. At the hospital, Plaintiff tested positive for cocaine. *Id.*; Dkt. No. 5-4 at 3. She also told physicians that she had not taken her medication as prescribed for several months because she did not think the medication was working and, in any case, did not know that she had refills. Dkt. No. 5-4 at 4; Dkt. No. 5-8 at 117. Ms. Ponce informed medical examiners that she was living at home with her boyfriend and her daughter, and that her daughter had taken all knives from the home so that Ms. Ponce could not use them to hurt herself. Dkt. No. 5-8 at 213, 216. In her recount of her prior suicide attempt in August 2022, Ms. Ponce told the evaluator that she had attempted to overdose on her medication, but that her boyfriend had stopped her by removing pills from her mouth. *Id.* During the April 2023 hospitalization, Ms. Ponce reported paranoia and said that her depression was at a 7/10. *Id.* She was taking her medications

as prescribed at the time. *Id.* at 217. Her medical examiner reported that she seemed to be minimizing her symptoms because she wanted to leave the hospital. *Id.* However, Ms. Ponce was deemed a risk to herself due to her suicidal ideations and plan to cut herself with a knife, and she was determined to be "a good candidate for Crisis Stabilization Unit." *Id.* at 218. At the time of her discharge, Ms. Ponce was considered a low risk to herself and others. *Id.* at 259.

At her follow-up appointment on April 24, 2023, Ms. Ponce confirmed that she had been adhering to her prescribed medication plan. *Id.* at 251. As a result, her symptoms and behavior were found to be normal, although she was still only evaluated as having "fair" insight and judgment. *Id.* at 254. Her progress was considered "baseline," one step above "residual symptoms" and one step below "stable," and her prognosis was "fair," one step above "poor." *Id.* at 256.

Unfortunately, it appears that Ms. Ponce's near stability was short lived. Less than two weeks later, on May 5, 2023, Ms. Ponce attended another follow-up evaluation and complained of irritability and mood swings. *Id.* at 260. She also displayed ruminations and paranoid delusions and reported auditory hallucinations. *Id.* at 262. As a result, her assessment level was "residual symptoms," two steps below "stable." *Id.* at 264. Although she did not wish to increase her Depakote dosage at that time, Plaintiff was given Trazodone to help her sleep. *Id.* at 260, 266.

After over two months without incident, Ms. Ponce returned to Border Region Behavioral Health on July 18, 2023, reporting that she had run out of medication one week prior and was not able to sleep and had experienced increased depression and anxiety. *Id.* at 271. She exhibited ruminations and obsessions and reported auditory and visual hallucinations. *Id.* at 272. Once again, her progress assessment was "residual symptoms," and her prognosis was "fair." *Id.* In

sum, after one week without her medication, Ms. Ponce began to experience decompensation—noting residual anxiety, depression, insomnia, and auditory hallucinations. *Id.* at 273.

Two months later, on September 16, 2023, Ms. Ponce saw Dr. Victor D. Treviño, who developed a care plan for her bipolar disorder along with her osteoarthritis. Dkt. No. 5-9 at 7. Dr. Treviño refilled her prescriptions for Lexapro, Depakote, and Topamax, and prescribed Seroquel. *Id.* Additionally, he noted that Ms. Ponce "had some behavioral disturbances and aggressiveness with mood changes as per her statement." *Id.* Part of her treatment plan was for Dr. Treviño to continue to monitor Ms. Ponce's outpatient care closely in conjunction with Border Region. *Id.* at 8.

At a follow-up appointment with Border Region to review her diagnoses on September 18, 2023, Ms. Ponce was diagnosed with Bipolar I disorder; anxiety disorder, unspecified; alcohol dependence, in remission; and Major Depressive disorder, recurrent, mild. Dkt. No. 5-8 at 269–70, 285. She reported that her dosage of Trazodone was no longer enough to help her sleep, so her dose was increased. *Id.* at 275. Ms. Ponce's treating physicians also increased her dosage for Depakote, Seroquel, and Lexapro. *Id.* At the September 2023 appointment, Ms. Ponce still exhibited ruminations, obsessions, paranoid/persecutory delusions, and reported auditory hallucinations. *Id.* at 276. Consistent with previous medical evaluations, Plaintiff's progress was assessed to be "residual symptoms," and her prognosis was "fair." *Id.* at 277.

Aside from regular check-ups with Dr. Treviño to treat her physical ailments, the record is quiet for nearly the next six months, until Ms. Ponce reported to Border Region Behavioral Health on March 4, 2024. Dkt. No. 5-9 at 102. At that time, Ms. Ponce reported that she was struggling with homelessness; she had spent one week in a hotel and was now residing in Bethany House, a homeless shelter in Laredo, Texas. *Id.* at 102. She reported occasional visual and audio

hallucinations but denied suicidal ideations. *Id.* She was assessed to have "residual symptoms" with a prognosis of "fair." *Id.* at 104.

On May 31, 2024, a few months later, Ms. Ponce returned to Border Region Behavioral Health, reporting distress and homelessness after her daughter kicked her out of the house due to an argument. *Id.* at 97. At her May 2024 evaluation, Ms. Ponce exhibited ruminations but no delusions or hallucinations. *Id.* at 98. However, her progress was still assessed as having "residual symptoms" with a prognosis of only "fair," due to ongoing anxiety and depression. *Id.* at 99–100. It was recommended that Plaintiff attend counseling. *Id.* at 101.

Ms. Ponce's most recent psychiatric evaluation of record is from June 15, 2024, conducted by Dr. Treviño as part of a holistic examination. *Id.* at 112. At that time, Dr. Treviño's assessment was largely positive:

> The patient is oriented to person, place, and time. Speech is fluent and words are clear. Thought processes are coherent, insight is good. There are no obsessive, compulsive, phobic or delusional thoughts; there are no illusions or hallucinations. Serial 7s accurate; recent and remote memory intact. The patient's fund of knowledge: awareness of current events and past history is appropriate for age. The patient's higher cognitive functions are intact; the patient can perform simple calculations and understands proverbs. The patient's mood is neutral and the affect appropriate; there are no loose associations.

*Id.* However, in addition to this overall assessment, Ms. Ponce's "Problem List" includes two notes regarding her bipolar diagnosis: "'[B]ipolar Affective Disorder, Current Episode Mixed' (Onset: 09/20/2023 – Active)" and "'[B]ipolar Affective Disorder, Currently Depressed, Moderate' (Onset: 01/10/2024 – Active)." *Id.* Overall, this most recent psychiatric assessment reflects a period of stability in June 2024, with Ms. Ponce subject to continuous evaluation of her bipolar symptoms.

In her Form SSA-3373, Plaintiff reported that she has an in-home caregiver, provided by Medicaid, who helps her to dress, bathe, care for her hair, shave, cook, use the toilet, and remember

to take her medication.  Dkt. No. 5-7 at 67.  This report is confirmed by the attached service provider visit plan, which states that the visiting care provider is to assist with tasks like taking medications, bathing, cleaning, dressing, escorting, grooming, shaving, oral care, laundry, meal preparation, routine hair and skin care, shopping, toileting, and walking.  *Id.* at 129.  Records further show that a doctor prescribed Plaintiff medication to treat her arthritis.  *Id.* at 57.  Additionally, in a letter dated December 28, 2023, Plaintiff's treating physician Dr. Treviño confirmed that Plaintiff also has osteoarthritis in multiple places and struggles to work due to her diagnoses and limited use of her fingers.  *Id.* at 286.

### *ALJ Hearing and Findings*

Ms. Ponce attended a telephonic hearing with the ALJ on July 9, 2024.  Dkt. No. 1 at 2.  At the telephonic hearing, Ms. Ponce was represented by counsel and provided testimony.  A Spanish interpreter was present at the hearing because although Ms. Ponce understands English, she is more comfortable speaking Spanish.  Dkt. No. 5-3 at 50.  Through her attorney, Ms. Ponce argued primarily that although she may be able to procure a job, "her functional capacity has deteriorated," that "due to her exertional and non-exertional limitations, she will not be able to work on a sustained basis," and that her mental limitations inhibit her "ability to meet the basic mental demands [of employment] on a sustained basis." *Id.* at 56.

The ALJ questioned Ms. Ponce, who stated that she stopped working largely due to her physical ailments, including the inability to use her left hand and back pain.  *Id.* at 57.  She further testified that she had lost the use of her left hand to the extent that if she were asked to pick up coins from the table, she would not be able to do so with her left hand.  *Id.*  When asked why she was hospitalized in August 2022, Ms. Ponce responded that she "wanted to finish with her life." *Id.* at 57.  She also testified to wanting to kill herself in April 2023, when she tested positive for

cocaine at the crisis stabilization unit. *Id.* at 59. While Ms. Ponce takes medication for her mental impairments, she testified that she experiences side effects of dizziness and drowsiness and requires somebody to remind her to take her medication. *Id.* at 60. When her provider is not available to remind her, Ms. Ponce stated that she has a friend who reminds her to take her medication. *Id.* at 61.

In addition to Ms. Ponce, the ALJ heard testimony from a vocational expert, Kay Gilreath. *Id.* at 72–78. Pertinent to Ms. Ponce's claims in this appeal, the ALJ questioned the vocational expert regarding a hypothetical individual's ability to maintain employment with Ms. Ponce's RFC:

> Q: . . . If the hypothetical individual is having difficulty maintaining concentration throughout the workday, such that they would be off task approximately 12 to 15 percent of the workday, is that too much off task time in your opinion?
>
> A: Well, I'm told, generally, I like to see 10 percent. Anything more than 10 percent I think starts to interfere with maintaining employment. Again, that's not directly addressed in the SCO, but based on my experience.
>
> Q: Okay. And if the hypothetical individual needed to take unscheduled breaks, so I know they get regularly scheduled breaks, but they needed perhaps an hour cumulatively over the course of a work day in unscheduled grades, would that be something that employers would generally permit?
>
> A: No, that would basically be someone below an eight-hour work day.
>
> Q: Okay. So no competitive employment under those circumstances?
>
> A: No.
>
> Q: Not in any way, no competitive full time employment. If the hypothetical individual were absent from work two days a month, is that acceptable, or does that exceed the tolerance for absenteeism?
>
> A: Again, it['s] not directly addressed in the SCO, but in my experience in unskilled jobs, anything consistently over a day a month starts to interfere with maintaining employment. So if it was factored only two days per month

unscheduled breaks, I would say the unskilled job rates, they could not maintain employment.

*Id.* at 74–75.

The ALJ denied Plaintiff's claim on July 31, 2024. Dkt. No. 1 at 2; Dkt. No. 5-3 at 27–38. In her decision, the ALJ found that Plaintiff meets the insured status requirements through March 31, 2026; that Plaintiff has not engaged in substantial gainful activity since July 31, 2022; that she has severe impairments of mood disorder, anxiety disorder, osteoarthritis of the hand, and cervical and lumbar degenerative disc disease; and that she does not have an impairment or combination of impairments equivalent to a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. Dkt. No. 5-3 at 29–31.

In finding that Plaintiff does not have a mental impairment that meets the listing requirements of 12.04 or 12.06, the ALJ relied on Plaintiff's June 2024 mental status exam. *Id.* at 31. The ALJ found that Plaintiff has a mild limitation in understanding, remembering, or applying information, and that she has moderate limitations interacting with others; concentrating, persisting or maintaining pace; and adapting and managing herself. *Id.* Thus, the ALJ found that Plaintiff did not meet the paragraph "B" criteria because her mental impairments did not cause her to have at least two "marked" limitations or one "extreme" limitation. *Id.* The ALJ further concluded that Plaintiff does not meet the paragraph "C" criteria because she "does not have a 'serious and persistent' mental disorder with a two-year or more history of medical treatment . . . ." *Id.* at 32.

After making the foregoing determinations, the ALJ found that Ms. Ponce has the RFC "to perform light work as defined in 20 [C.F.R. §] 404.1567(b) and 416.967(b) except [she] is limited to standing/walking no more than 4 hours in an 8-hour work day, with frequent handling and fingering." *Id.* Additionally, the ALJ found that Ms. Ponce "is limited to initiating and carrying

out to completion simple, routine tasks and making simple decisions.  [She] is limited to occasional interaction with the public and occasional changes in the work setting."  *Id.*

In making this finding, the ALJ considered that Plaintiff "alleges disability mainly due to back issues, arthritis, and mental health impairments," and that "she has been hospitalized for depression and bipolar disorder in the past with the last time occurring in August 2022 because she wanted to finish with her life."  *Id.* at 32–33.  The ALJ found that Plaintiff reported being okay with treatment of her mental ailments since she got out of the hospital, and that she takes medication for her mental ailments that causes side effects like dizziness and drowsiness.  *Id.* at 33.  Moreover, Plaintiff used cocaine once in 2023 when she wanted to kill herself.  *Id.*

The ALJ ultimately found that "the medical evidence of record does not support a finding that these issues would preclude claimant from working."  *Id.*  To reach this conclusion, the ALJ considered medical evidence from Plaintiff's June 2022 evaluations and her August 2022 hospital visit.  *Id.*  The ALJ considered that on June 1, 2022, records, Plaintiff indicated that she had not taken medication for months because she did not know that she had refills and, in any case, did not believe that the medication was working.  *Id.*  She reported mood instability, isolation, low motivation, and crying spells, and she noted hearing voices three times in the prior two months, "but denied paranoia, psychosis, or suicidal ideation."  *Id.*  The ALJ noted that on June 15, 2022, Plaintiff reported uncontrollable anger issues and trouble learning at work.  *Id.*  Although the examination reported that she was "engaging and oriented, and had normal speech, irritable mood with congruent affect, fair insight and judgment, and normal thought processes," she was also expressing "ruminations, obsessions, and paranoia."  *Id.*  The ALJ considered her prescriptions for divalproex, Lexapro, propranolol, and Seroquel.  *Id.*

Next, the ALJ addressed Plaintiff's emergency room visit on August 14, 2022, due to her suicide attempt by taking pills and alcohol. *Id.* "She reported that she had been taking medication every day but was having command hallucinations daily telling her to kill herself or others." *Id.* The medical records show that Plaintiff's behavior stabilized after receiving medication and therapy, and she was released four days later. *Id.* The ALJ considered subsequent treatment and evaluations regarding Plaintiff's mental health. Notably, from August 2022 through March 2024, Plaintiff continued to complain of anxiety, depression, mood swings, hearing voices, crying spells, anger, and suicidal thoughts. *Id.* at 34. In response to these fluctuations, her treating physicians continued to adjust the dosage of her medications. *Id.* She was once again taken to the emergency room on April 19, 2023, due to suicidal ideations and tested positive for cocaine. *Id.* She reported that her depression was a seven out of ten. *Id.* At her follow-up five days later, "she had a fairly stable mood" and was reported to be "compliant with medication." *Id.* The ALJ noted that Plaintiff continued to report "ongoing anxiety, irritability, and mood swings along with sleep problems in July and September 2023 treatment notes." *Id.* In May 2024, Plaintiff reported being homeless. *Id.* While she denied auditory or visual hallucinations or suicidal ideations, "she had dysphoric, anxious, and depressed mood with congruent and anxious affect and ruminations, but otherwise normal mental status findings." *Id.*

The ALJ found the opinions of the state agency's medical consultants, Renee E Ph.D., and Nicole Mannis, Psy.D., partially persuasive, and the March 2024 medical source statement of Victor D. Treviño, M.D., regarding the nature and severity of the individual's mental impairments not persuasive. *Id.* at 35. Taking these factors and credibility determinations into consideration, the ALJ concluded that Plaintiff's "mental health has been generally stable after a 2022 short inpatient stay," and that "the claimant is generally stable with medication management and no

12

substance use." *Id.* Accordingly, the ALJ determined that Plaintiff has the residual functional capacity to perform light work but is limited to standing/walking no more than four hours in an eight-hour workday, with frequent handling and fingering, and is limited to initiating and carrying out simply, routine tasks and making simple decisions. *Id.* at 32.

The ALJ further found that Ms. Ponce is unable to perform any past relevant work, but that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.* at 36–37. As such, the ALJ concluded that Ms. Ponce is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and is therefore not disabled for the purposes of the Social Security Act. *Id.* at 37.

The Appeals Council denied review of the ALJ decision on August 22, 2024. *Id.* Plaintiff was granted an extension to file a civil action and proceeded to file the instant suit appealing the ALJ's decision to this Court on February 18, 2025. *Id.*

### *Legal Standards*

To receive benefits under Title II and Title XVI of the Social Security Act, a claimant must be disabled. 42 U.S.C. § 423(a)(1). Disability under the Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that has lasted or can be expected to last for at least twelve months. 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential, five-step inquiry to determine whether a claimant is disabled:

> whether (1) the claimant is currently engaged in substantial gainful activity, (2) [she] has severe impairment, (3) the impairment meets or equals the severity of a listed impairment in Appendix 1 of the regulations, (4) the impairment prevents the

claimant from performing past relevant work, and (5) the impairment prevents [her] from doing any other work.

*Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002) (citing 20 C.F.R. §§ 404.1520; *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)). A final determination of disabled or not disabled at any step terminates the inquiry. 20 C.F.R. § 404.1520(a)(4). As part of step three, mental impairment listings "require[] the ALJ to analyze, among other factors, the 'paragraph B' criteria, which describe four broad areas of mental functioning. . . . To meet the paragraph B criteria, the claimant must have an extreme limitation in one or a marked limitation in two of the areas." *Miranda v. Kijakazi*, Civil Action H-21-1029, 2022 WL 4359230, at \*5 (S.D. Tex. Aug. 29, 2022) (report and recommendation). "On the first four steps of the analysis, the claimant has the initial burden of proving that she is disabled. The burden shifts to the Secretary on the fifth step to show that the claimant is capable of performing work in the national economy and is therefore not disabled." *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam).

Between steps three and four, the ALJ determines the claimant's RFC. 20 C.F.R. § 404.1520(a)(4). A claimant's RFC, or ability to engage in substantial gainful activity despite their impairments, is used in steps four and five to determine if the claimant can still perform their past work or other relevant work. 20 C.F.R. § 404.1520(e). "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996) [hereinafter SSR 96-8p]. When assessing an individual claimant's RFC, the ALJ must review "all of the relevant evidence in the case record." *Id.*

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," which typically means eight hours a day, for five days per week, or its equivalent. SSR 96-8p at 34475. Therefore, the "ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar*

14

*v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003) (on petition for rehr'g)); *see also* 20 C.F.R. § 404.1545(b) (2002). Accordingly, the Fifth Circuit has held that a claimant's ability to engage in substantial gainful activity is not only the ability to find and perform certain jobs, "it also requires a determination that the claimant can *hold* whatever job [s]he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986).

Because the ability to sustain work is inherent in the RFC finding, the ALJ need not make a separate finding of the claimant's ability to sustain employment in every case. *Dunbar*, 330 F.3d at 672; *see also Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005) ("Without such a showing [that the claimant's symptoms wax and wane], the claimant's ability to maintain employment is subsumed in the RFC determination."). However, "[i]n situations in which the claimant has either a non-exertional impairment or an exertional impairment that waxes and wanes in its manifestation of disabling symptoms, it must be determined whether the claimant's symptoms are such that they would preclude him from maintaining work." *Moore v. Colvin*, No. 5:13-CV-153-C, 2014 WL 2767210 at 3 (N.D. Tex. June 18, 2014). Such a finding is needed in circumstances where there is "evidence that a claimant's ability to maintain employment would be compromised despite [their] ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar*, 330 F.3d at 672; *see also Hammock v. Colvin*, No. A-13-CA-0707-AWA, 2014 WL 7013886, at *11 (W.D. Tex. Dec. 12, 2014) ("When the ALJ shows an appreciation for the claimant's ability to sustain work in defining the RFC, a separate analysis is not required.").

To require the ALJ to make a separate finding regarding a claimant's ability to sustain work, the claimant must make a sufficient showing that their "ailment waxes and wanes in its

manifestation of disabling symptoms," and that "the claimant's intermittently recurring symptoms [are] of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." *Frank*, 326 F.3d at 619. In other words, "[t]he severity of the ailment must prevent the applicant from sustaining work for a significant time." *Hammock*, 2014 WL 7013886, at *10. To illustrate, the Court in *Frank* explained that "if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination." *Frank*, 326 F.3d at 619. However, "more than a mere diagnosis of bipolar disorder" is required "to determine that the impairment waxes and wanes in its manifestation of disabling symptoms such that a separate finding regarding the claimant's ability to maintain work is required." *Barnes v. Comm'r*, Civil Action No. 3:22-CV-692-HTW-RPM, 2024 WL 4645498, at *7 (S.D. Miss. Aug. 12, 2024) (report and recommendation) (quoting *Crainey v. Astrue*, No. 4:11-CV-613, 2012 WL 5846406, at *7 (N.D. Tex. Nov. 1, 2012) (collecting cases)).

Plaintiffs must exhaust their administrative remedies before appealing an ALJ's opinion to the district court. However, because administrative social security proceedings are not adversarial, courts generally do not require claimants to exhaust every issue at the administrative level. *See Sims v. Apfel*, 530 U.S. 103 (2000) (holding that plaintiff who exhausted administrative remedies was not also required to exhaust issues in a request for review by the Appeals Council). Issues not briefed on appeal, however, are waived.[2]

---

[2] Although this district does not have distinct local rules for Social Security Appeals, our sister district courts in Texas have limited their review to issues raised in the parties' briefs submitted after the administrative transcript. *See, e.g.*, *Nehlig v. Comm'r of Soc. Sec. Admin.*, 40 F. Supp. 2d 841, 848 (E.D. Tex. 1999) ("[T]his court's review is restricted to points of error and argument specifically raised and discussed in briefs submitted after the administrative transcript is filed."); *Avery v. Bisignano*, MO:24-CV-00272-DC-RCG, 2025 WL 3900265 at *1 n.2 (W.D. Tex. Dec. 19, 2025) (report and recommendation) ("[T]he Court only considers the issue actually raised and developed in Plaintiff's Brief."); *Linda Michelle M. v. Saul*, No. 3:19-CV-00328-B-BT, 2020 WL 470279 at *1 (N.D. Tex. Jan. 28, 2020) (refusing to address issues not fully briefed for the magistrate judge).

"[T]he ALJ's determination is entitled to considerable deference." *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); 42 U.S.C. § 405(g). However, the reviewing court may vacate the Commissioner's decision if it "cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Legget v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see also Paul v. Shalala*, 29 F.3d 208, 210 (5th Cir. 1994) (citing *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam)) ("Our review of the Secretary's final decision is limited to two inquiries: (1) whether substantial evidence of record supports the Secretary's decision; and (2) whether the decision comports with relevant legal standards.") (overruled on other grounds). Specifically, "[i]f an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole." *Hammock*, 2014 WL 7013886, at *5 (citing *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)).

Remand is only appropriate where the plaintiff shows that they were prejudiced. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *see also Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected."); *Miller v. Kijakazi*, No. 22-60541, 2023 WL 234773 at *3 (5th Cir. Jan. 18, 2023) ("[R]emand is warranted only if the ALJ's error was harmful."); *Avery v. Bisignano*, MO:24-CV-00272-DC-RCG, 2025 WL 3900265 at *8 (W.D. Tex. Dec. 19, 2025) (report and recommendation) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)) ("[I]n the event the Court finds the ALJ erred, the Court will address whether any alleged error was harmful."). Likewise, "[v]iolation of a social security ruling or regulation merits remand only when a claimant affirmatively demonstrates prejudice." *McPeters v. Astrue*, Civil Action No. 1:07-CV-0112-C, 2008 WL 4414542, at *9 (N.D. Tex. Sept. 30, 2008).

The sole issue on this appeal is whether the Commissioner erred as a matter of law by failing to consider Ms. Ponce's ability to maintain substantial gainful activity, given the "waxing and waning nature" of her impairments. Dkt. No. 7 at 7. Specifically, Ms. Ponce argues that her "mental health symptoms are severe and frequent enough that the ALJ erred by not making a specific finding regarding the Plaintiff's ability to sustain employment." *Id.* at 11. Moreover, Plaintiff argues that she was prejudiced by this error because the waxing and waning nature of Plaintiff's mental impairments could have made her RFC more restrictive. *Id.* at 14. The Court agrees.

In *Singletary v. Bowen*, the Fifth Circuit held that the ALJ had not sufficiently considered Singletary's ability to "obtain *and maintain* employment." *Singletary*, 798 F.2d at 823. The court noted that his "chaotic personal life," inability to "remain employed for more than limited periods of time," repeated hospitalizations for psychiatric problems, and "inappropriate behavior and poor social adjustment" indicated that a separate inquiry into whether Singletary could sustain employment was necessary. *Id.* Thus, *Singletary* stands for the proposition that, in certain circumstances, the ALJ is required to make a separate finding that a claimant can sustain employment once they have obtained it.

While the ALJ is not required to make a finding regarding a claimant's ability to maintain employment in every case, they must at least consider evidence that the claimant may not have the ability to maintain employment despite the "ability to perform employment as an initial matter," and the ALJ must "appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Dunbar*, 330 F.3d at 672. In fact, where "the claimant has either a non-exertional impairment or an exertional impairment that waxes and wanes in its

manifestation of disabling symptoms, it must be determined whether the claimant's symptoms are such that they would preclude him from maintaining work." *Moore*, 2014 WL 2767210, at 3.

The Fifth Circuit has subsequently clarified the circumstances under which the ALJ must make a separate determination that a claimant is able to sustain employment. "Intermittently recurring symptoms from an impairment must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time." *Latoski v. Astrue*, No. 2:09-CV-0198, 2011 WL 4526086, at *14 (N.D. Tex. Sept. 13, 2011). Examples of claims that do not rise to the level of "waxing and waning" symptoms include "(1) that the claimant has good days and bad days; (2) that pain from epidural injections would vary in intensity or wax and wane; and (3) the opinion of a health manager that the plaintiff would not be able to work thirty hours a week on a reliable basis." *Dukes-Ardoin v. Astrue*, Civil Action No. H-10-426, 2011 WL 3273067, at *12 (S.D. Tex. July 28, 2011).

While the Plaintiff must present sufficient evidence to trigger the need for a separate inquiry into her ability to maintain employment, *see Frank*, 326 F.3d at 620, the Court finds that she has met this burden here. In fact, the Court finds that the record in this case bears a striking resemblance to that in *Singletary*, and that Plaintiff's own bouts of homelessness, sporadic employment history, repeated hospitalizations for psychiatric problems, need for in-home care including reminders to take her medication, and consistent irritability and difficulty following instructions triggered a need to inquire into her ability to sustain employment. The necessity of this inquiry was also highlighted by Ms. Ponce's argument at the administrative hearing that she "may be able to get a job, but due to her exertional and non-exertional limitations, she will not be able to work on a sustained basis and that her mental limitations [apply substantially to] the ability to meet the basic mental demands on a sustained basis." Dkt. No. 5-3 at 56.

Indeed, even the vocational expert's testimony at the administrative hearing cast doubt on Ms. Ponce's ability to sustain employment despite sporadic interruptions caused by her mental health symptoms and medication side effects. *See id.* at 74–75. At the ALJ hearing, the vocational expert addressed the ability to sustain employment at three different levels: the degree to which the individual would be off task during the workday, the number of unscheduled breaks the individual would need, and the number of days the individual would need to be absent for treatment. *Id.* at 75. The vocational expert opined that being off task for more than ten percent of the day "starts to interfere with maintaining employment." *Id.* She noted that taking too many unscheduled breaks "would basically be someone below an eight-hour work day." *Id.* And, drawing from her experience, she opined that being absent "consistently over a day a month starts to interfere with maintaining employment." *Id.* In light of this testimony from the vocational expert, the ample evidence of Ms. Ponce's drowsiness from her medication and difficulty following instructions, her occasional auditory and visual hallucinations, and other manifestations of her bipolar symptoms, as well as the frequency of her medical treatment, should have triggered the need for the ALJ to make a finding regarding her ability to sustain employment.

Therefore, although a diagnosis of bipolar alone is insufficient to show waxing and waning symptoms, "the evidence in this case was not so limited. By its very nature, Plaintiff's bipolar disorder fluctuates between manic and depressive states with periods of apparent stability." *Cline v. Astrue*, 577 F. Supp. 2d 835, 850 (N.D. Tex. 2008) (holding that the ALJ erred "[b]y failing to make the specific determination required by *Singletary*").

In contrast to *Cline*, in *Dukes-Ardoin*, the court held that the plaintiff had not met her burden of production because her medications were *successfully* controlling her ailments, and she never alleged that she was only able to work for short periods of time. *Dukes-Ardoin*, 2011 WL 3273067,

at *12. This case differs from *Dukes-Ardoin* on both fronts. Although Ms. Ponce's medications increase her stability, they are not always a reliable and accessible remedy for her mental ailments. Moreover, Ms. Ponce has explicitly argued that despite her ability to obtain a job, her ailments render her unable to maintain employment. Dkt. No. 5-3 at 56. It is clear from the extensive medical records that Ms. Ponce's medication regimen has been a saga of trial and error. She was assessed at "baseline" only once—immediately after an overnight hospital visit. Dkt. No. 5-8 at 256. The remainder of her assessments placed her with "residual symptoms," two steps below "stable." Dkt. No. 5-8 at 201, 256, 264, 272, 277; Dkt. No. 5-9 at 99–100, 104. Moreover, nearly every time she was evaluated, the treating physician changed her dosage or added an additional medication to address new or lingering issues. *See, e.g.*, Dkt. No. 5-8 at 196, 266, 275. Ms. Ponce's medication prescriptions, like her mental health assessments, were markedly less than stable.

Additionally, unlike the plaintiff in *Dukes-Ardoin*, Ms. Ponce provided ample evidence and arguments of her inability to sustain work for more than short periods of time, either due to her inability to understand instructions or due to fatigue caused by her medications. *See id.* at 194; Dkt. No. 5-3 at 59. While the ALJ acknowledged Ms. Ponce's many medication adjustments in her opinion, these facts should have triggered further inquiry into whether Ms. Ponce's symptoms wax and wane with such severity and frequency that they interfere with her ability to sustain employment. Accordingly, the Court holds that the ALJ was required to determine whether Ms. Ponce can sustain employment, either separately or as part of the RFC determination, as a matter of law.

Nor did Ms. Ponce's short-term stability with medication obviate the need for the ALJ to evaluate Plaintiff's ability to sustain employment in this case. Although a condition that can

reasonably be remedied by medication is not disabling, the condition may be disabling if the claimant is unable to obtain or adhere to proper treatment or medication. *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (holding that if the claimant cannot afford or obtain prescribed treatment or medication, the condition may still be disabling). Additionally, while a claimant must follow their prescribed treatment to be eligible for disability benefits, they may still qualify if they fail to follow their prescribed plan for good cause. 20 C.F.R. § 404.1530(a)–(b); *Williamson v. Colvin*, Civil Action No. 4:13-CV-01733, 2014 WL 12537164, at *13 (S.D. Tex. Aug. 21, 2014); *see also* SSR 18-3p, 83 Fed. Reg. 49616, 49617, 49620 (Oct. 2, 2018).

Here, although Ms. Ponce appears to stabilize following treatment, the record does not support the conclusion that Ms. Ponce is able to consistently maintain the prerequisite medication management for her stability. In fact, it appears that her ailments and circumstances frequently render her unable to consistently manage her medication without assistance—she typically requires somebody else to remind her to take her medication, and sometimes she must have somebody else control her medication so that she cannot misuse it for self-harm. Dkt. No. 5-7 at 67; Dkt. No. 5-8 at 216, 221, 225.

Courts in the Fifth Circuit have held that where mental ailments "var[y] in intensity and sometimes—but not always—[are] controlled with medication, the ALJ [has] an obligation to include in her ruling a separate finding concerning the claimant's ability to sustain employment." *Cormier v. Colvin*, No. 6:15-CV-01773, 2016 WL 3024743, at *10 (W.D. La. May 3, 2016). This obligation is particularly significant in this case because Ms. Ponce's access to her medication is limited by necessity. Not only does Plaintiff require reminders to take her medication, but at times her boyfriend or family has maintained control of her medication to prevent her from overdosing on it. In fact, overdosing on her medication has been a consistent motif across her suicide attempts

and ideations.  Dkt. No. 5-8 at 216, 221, 225.  Due to these complicating circumstances, the effectiveness of Ms. Ponce's medication regimen did not dispel the ALJ's duty to determine whether Ms. Ponce can sustain employment despite her waxing and waning mental health symptoms.

Furthermore, the ALJ's determination of Plaintiff's residual functional capacity did not adequately address Plaintiff's ability to sustain employment on a regular and continuing basis. This case differs from *Franco v. Colvin*, for example, because it is not clear that the ALJ considered Plaintiff's ability to sustain employment as part of her RFC determination.  In *Franco*, the court held that the plaintiff failed to show that "his condition waxes and wanes with a frequency or intensity not taken into account when the ALJ assessed the RFC."  *Franco v. Colvin*, No. EP-14-CV-351-MAT, 2016 WL 1299016, at *6 (W.D. Tex. Mar. 31, 2016).  There, the ALJ considered Franco's "episodes of decomposition," their frequency, and the length of his stability with proper medication.  *Id.* at *4–*5.  Here, in contrast, the ALJ noted Ms. Ponce's stability immediately following treatment but did not assess the length of her stability outside the hospital walls.  This finding seems particularly imperative in this case because the evaluator at Ms. Ponce's last hospitalization suspected that she was *minimizing* her symptoms to be allowed to leave the hospital.  Dkt. No. 5-8 at 217; *cf. Latoski*, 2011 WL 4526086, at *14 (holding that plaintiff did not present enough evidence to show waxing and waning symptoms where her "behavior was also described as contrived").

Similarly, in *Miranda v. Kijakazi*, a court in this district affirmed the ALJ's denial of social security benefits where "[t]he ALJ made a specific finding that Miranda's symptoms 'waxed and waned'" and "considered the frequency of Miranda's treatment appointments" in his RFC determination.  *Miranda*, 2022 WL 4359230, at *6, *8.  Here, in contrast, the ALJ specifically

noted several factors that should have come to bear on her ability to sustain employment, including Plaintiff's bouts of homelessness, multiple suicide attempts, and changing medication prescriptions with their side effects, but the ALJ did not determine whether these circumstances would affect Plaintiff's ability to sustain work. The ALJ also neglected to address several factors in the RFC determination that could affect Plaintiff's ability to sustain employment, including the vocational expert's testimony regarding Plaintiff's ability to sustain employment, the severity of the side effects of Plaintiff's medications, and her limited access to her medications. Nor did the ALJ make a finding whether there was good cause for Plaintiff to be denied immediate access to her medications. *See* 20 C.F.R. § 404.1530(a)–(b); *Williamson*, 2014 WL 12537164, at *13. The collective impact of these factors would plausibly cause frequent disruptions to Plaintiff's ability to work—frequent disruptions directly traceable to her mental impairments. Therefore, because Plaintiff's ability to sustain employment was not fully subsumed by the RFC determination in this case, the ALJ erred as a matter of law by failing to make a separate finding regarding whether Plaintiff can sustain employment.

Additionally, the Court finds that Plaintiff was prejudiced by this error, as the inability to sustain employment once hired would constitute a further limitation on her residual functional capacity. It is possible that such a limitation would diminish Plaintiff's ability to engage in light work, as determined by the ALJ. Because Plaintiff was prejudiced by the ALJ's failure to make the requisite findings in this case, remand is appropriate to resolve the issue of whether the Plaintiff can obtain and sustain employment to be considered not disabled. *See Ripley*, 67 F.3d at 557; *Dellolio v. Heckler*, 705 F.2d 123, 128 (5th Cir. 1983) ("The absence of the requisite findings by the ALJ compels a remand for resolution of the question . . . .").

*Conclusion*

For the foregoing reasons, Ms. Ponce's Petition, Dkt. No. 1, is hereby **GRANTED**.  The decision of the Administrative Law Judge (ALJ) is hereby **VACATED**, and the case is **REMANDED** for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g) to determine whether the claimant can both procure and sustain substantial gainful employment, rendering her not disabled for the purposes of the Social Security Act.

IT IS SO ORDERED

Signed this March 31, 2026, in Laredo, Texas.

Diana Song Quiroga
United States Magistrate Judge